IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION


TIFFANIE MIDDLETON                                    PLAINTIFF

VS.                         06-2205

AMERICAN STANDARD COMPANIES,
d/b/a THE TRANE COMPANY, and
CLAY GRAHAM, INDIVIDUALLY                             DEFENDANT

<u>MEMORANDUM OPINION AND ORDER</u>

Currently before the Court are Defendants' motion for summary judgment (Doc. 19), Plaintiff's response (Doc. 22) and Defendants' reply (Doc. 25). Plaintiff Tiffanie Middleton claims Defendant American Standard Companies d/b/a The Trane Company ("Trane") violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (2005), and the Arkansas Civil Rights Act of 1993 ("ACRA"), Ark. Code Ann. § 16-123-101 *et seq.* (2005), by discriminating against her based on her gender and by discharging her in retaliation for lodging complaints of gender discrimination. Plaintiff alleges Defendant Clay Graham, Trane Human Resource Leader, committed similar violations of ACRA.

As reflected herein, Defendants' motion is GRANTED and Plaintiff's claims are DISMISSED WITH PREJUDICE.

**I.   Background**

On February 27, 2006, Trane hired Plaintiff as an assembler in its air conditioner manufacturing plant. As an

hourly employee, Plaintiff's employment was subject to a Collective Bargaining Agreement (the "CBA") with the United Auto Workers (the "UAW"), Local 716.   Under the CBA, new employees are subject to a ninety-day probationary period, during which even one occurrence[1] absence is good cause for termination.   Plaintiff weathered her probationary period without incident, but had four occurrences within ten weeks following the end of her probationary period. (Doc. 21-1 ¶ 6; Doc. 24 ¶ 6.)   Pursuant to Trane's disciplinary procedure, Trane issued Plaintiff a "Four Occurrence Letter" on September 7, 2006, warning her that additional occurrences within a twelve-month period would warrant disciplinary action and ten occurrences in a twelve-month period would result in termination. (Doc. 21-9 p. 10.)   In addition to Plaintiff's occurrence absences, Plaintiff reported four on-the-job accidental injuries within six months following her probationary period. (Doc. 21-1 ¶ 9; Doc. 24 ¶ 9.)   On June 30, 2006, Plaintiff suffered a contused head injury after stepping onto an assembly line in the plant to "screw down a wire." (Doc. 21-9 p. 14.)

On August 23, 2006, Trane posted on its bulletin board an opening on Line W-80 for a sub-assembly brazer ("SAB"). (Doc.

---

[1] An occurrence is defined as an absence of indefinite length attributable to a single cause, such as an illness.

21-9 p. 28.)  Line W-80 was a temporary line created to complete inventory before the end of September, when Trane traditionally undergoes a mass layoff.  The SAB position consists of "pinning," which entails connecting copper tubes with copper coils inside cooling units, "brazing," which entails sealing those connections with gas torches, "dipping" which entails submerging units in water to reveal and repair leaks, and attaching valves to the cooling units.  While handling a gas torch is referred to as brazing, each of the tasks described above fall under the brazer classification. The CBA invests Trane with discretion to assign employees to perform any task within their classification.  (Doc. 21-1 ¶ 12; Doc. 24 ¶ 12.)  Thus, SAB supervisors, referred to as Line Production Leaders, may assign brazers to pin, braze, dip, or any other function within the SAB classification.

After observing Line W-80, Plaintiff bid on the open brazer position.  Plaintiff was the bidder with the most seniority and received the position pursuant to a CBA provision which makes seniority the sole determiner for hiring and advancement decisions.

There were eight SAB workers on Line W-80 including Plaintiff, and while only four of those operated gas torches, all were required to be trained to operate gas torches. Plaintiff trained with fellow SAB Sidney Williams.  Plaintiff

was permitted to braze for approximately three hours on Thursday, September 7, 2006. The braze trainer told Plaintiff that she was too slow and should learn how to pin. (Doc. 21-9 p. 47.) However, Plaintiff was given an opportunity on Friday, September 8, 2006 to operate a torch on the line while Williams pinned. In order for a production line to make rate[2], brazers must complete one coil every three minutes. (Doc. 21-1 ¶ 41; Doc. 24 ¶ 41.) Defendants contend Plaintiff took 15 to 30 minutes to braze one coil. (Doc. 21-1 ¶ 42.) Plaintiff contends she took "10, 15 minutes maybe." (Doc. 24 ¶ 42; Middleton Dep. p. 67.) The parties agree that Line W-80 could not make rate with Plaintiff operating a gas torch. (Doc. 21-1 ¶ 43; Doc. 24 ¶ 43.)

Plaintiff's supervisor informed her that she took too much time to complete the task, and she was reassigned to pinning. While the pinning function was within Plaintiff's duties as a SAB, the reassignment upset Plaintiff because she expected to operate a torch, and she temporarily left the line. When Plaintiff returned, she was told that she could braze on Monday, but for the remainder of the workday she was to continue pinning because it was Friday and her supervisor

---

[2]
"Rate" refers to the daily quota necessary to satisfy Trane's Production schedule. However, Plaintiff contends the phrase is somewhat misleading, as a line that "makes rate" may finish early and be idle prior to the end of a work day. (Doc. 24 ¶ 41.)

wanted to "get rate and get done early."[3]  (Doc. 21-9 p. 36.)

On Monday, September 11, 2006, another SAB, Scott Young, was transferred into an open position on Line W-80.  Because Young was a proficient brazer and could meet production standards, Plaintiff's supervisor determined that Young would operate the torch while Plaintiff pinned.  (Doc. 21-1 ¶¶ 38-39; Doc. 24 ¶¶ 38-39.)  Plaintiff was again told she was too slow to braze.

Plaintiff demanded a meeting with her Union Representative, Bryan Vanderburg, and her supervisor to discuss her exclusion from using a torch.  Vandenburg agreed with Rice that pinning was within Plaintiff's job classification and part of her duties.  Vandenburg advised Plaintiff to make a written complaint to the Human Resources Department.  On September 15, 2006, Plaintiff met with Trane Human Resource Manager Patrick Lewis and Vandenburg. Plaintiff delivered her handwritten complaint.  There is a dispute among the parties as to the nature of Plaintiff's complaints at that meeting and in other instances.  Plaintiff contends that she told Lewis when she delivered her handwritten complaint that she had been "replaced by a guy." (Doc. 24 ¶ 52; Middleton Dep. p. 76.)  The written complaint

---

[3]

Plaintiff suggests her supervisor decided to let her braze for fear that she would complain to her union representative that she was being treated unfairly.  (Doc. 21-9 p. 36.)

(Doc. 21-9 pp. 36-37.) does not mention gender.  Lewis made notes during his meeting with Plaintiff, and those notes do not mention gender.  (Doc. 24 ¶ 54.)  Defendants contend Plaintiff did not indicate at any time that she intended her complaints concerning her job duties to be complaints of gender discrimination and that Defendants at no time perceived her complaints as such.  (Doc. 21-1 ¶ 36; Doc. 20 p. 6.)  In response, Plaintiff offers her testimony that she "did tell [Lewis] that [she] was being replaced by a guy." (Doc. 23-1 p. 2; Middleton Dep. p. 75-76.)  Plaintiff's testimony continues:

> Q:  Okay.  Did you tell him you thought it was sex discrimination?
>
> A:  Not in those words.  I was replaced by a guy.
>
> Q:  Did you tell him that you thought the reason you were being replaced was because you are a woman?
>
> A:  I may have.
>
> Q:  Well, do you remember telling him that?
>
> A:  Yes, I may have.  Yes.
>
> Q:  Well, I may have isn't you remembering telling him that.  I may have is it's possible that you did.  I would interpret that to be that you can't be certain.
>
> A:  I told him that I was being replaced by a guy.
>
> Q:  Okay.  But did you tell him you thought the reason was because you were a woman?

A:   I'm thinking.

Q:   Okay.

A:   I believe I did.  After thinking about the
     meeting, I believe I did.

(Doc. 23-1 p. 2; Middleton Dep. pp. 75-76.)

On September 20, 2006, in anticipation of its seasonal layoff, Trane required supervisors to complete so-called "Lack Of Work" or "LOW" evaluations, in which they evaluated and made recommendations for rehiring laid off employees.  Those rehiring recommendations would later be the sole determiner of whether laid off employees would be recalled.  (Doc. 24 ¶ 75; Doc. 21-1 ¶ 75.)  Plaintiff's Line Production Leader, Dennis Rice, advised supervisors under his authority that employees with attendance problems should not be recommended for rehire.  Additionally, Trane determined that every employee having less than one year of employment and a Four Occurrence Letter would receive a recommendation against rehire.  (Doc. 21-1 ¶ 67; Doc. 24 ¶ 67.)  At the time of Plaintiff's LOW evaluation, Plaintiff had a Four Occurrence Letter and had been employed for approximately seven months.  Accordingly, she was given a recommendation against rehire.  (Doc. 21-10 p. 6.)  In Plaintiff's LOW evaluation, her supervisor notes that Plaintiff complains about job assignments, is accident prone and lacks experience.  (Doc. 21-10 p. 6.)

On September 22, 2006, Trane underwent a seasonal mass layoff, involving approximately 147 employees. Directly following the layoff, Trane estimated it would need to recall approximately 10 employees within one month of the layoff. Under the CBA, the most senior employees were to be the first recalled. Among the 147 employees laid off on September 22, 2006, Plaintiff was the most senior. However, because Trane interpreted the CBA not to give recall rights to employees with less than one year of employment, Trane decided not to recall employees who had less than one year of employment and a recommendation against rehire. Because Plaintiff had less than one year of employment and a recommendation against rehire, she was not eligible for recall. The Human Resource Department relied exclusively on LOW evaluations in determining which of the most senior employees would be recalled. (Doc. 24 ¶ 75; Doc. 21-1 ¶ 75.) Plaintiff and two senior male employees, Blake Perritt and Delbert Sawyer, were not recalled due to their recommendations against rehire. Each of the employees was sent a termination letter, stating that the employee was being terminated for performance reasons. However, the UAW filed a grievance in support of recall rights for employees, like Plaintiff, with less than one year of employment. Employees with more than one year of experience were expressly given recall rights and safe harbor

from termination during their "continuity of service" periods[4]. The grievance resulted in an amendment to the CBA granting continuity of service protections for employees with less than one year of employment. Plaintiff's termination letter was revoked. However, Trane ultimately did not need to recall any employees from the September 22, 2006 layoff, and Plaintiff never returned to active employment with Trane.

Plaintiff filed a charge with the Equal Employment Opportunity Commission (the "EEOC") alleging sex discrimination and retaliation. The EEOC Investigator found that Plaintiff was not subject to gender discrimination and there could be no retaliation since Plaintiff never voiced a complaint of gender discrimination. (Doc. 21-10 p. 36.) The EEOC Investigator recommended that Plaintiff's charge be dismissed and her case closed. (Doc. 21-10 p. 36.)

## II.  Standard of review

A motion for summary judgment will be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A "material" fact is one "that might affect the outcome of the suit under the governing law ...."

---

[4]

Continuity of service refers to a period of time equal in length to the number of days actually worked by an employee, during which that employee cannot be terminated.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). A "genuine" issue of material fact exists when there is sufficient evidence favoring the party opposing the motion for a jury to return a verdict for that party. *Anderson,* 477 U.S. at 248. In determining whether a genuine issue of material fact exists, the evidence is to be taken in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157 (1970). If the moving party meets the initial burden of establishing the nonexistence of a genuine issue, the burden then shifts to the opposing party to produce evidence of the existence of a genuine issue for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). The opposing party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial," and "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." *Anderson,* 477 U.S. at 256-57 (citing Fed. R. Civ. P. 56(e)). In order to withstand a motion for summary judgment, plaintiffs must substantiate their allegations with "sufficient probative evidence [that] would permit a finding in [their] favor on more than mere speculation, conjecture, or fantasy." *Gregory v. Rogers,* 974 F.2d 1006, 1010 (8th Cir. 1992), *cert. denied,* 507 U.S. 913 (1993). A mere scintilla of evidence is insufficient to avoid

summary judgment. *Moody v. St. Charles County,* 23 F.3d 1410, 1412 (8th Cir. 1994). Although summary judgment is to be used sparingly in employment discrimination cases, *see Crawford v. Runyon,* 37 F.3d 1338, 1341 (8th Cir.1994), it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim. *See Chock v. Northwest Airlines, Inc.,* 113 F.3d 861, 865 (8th Cir. 1997). Plaintiffs alleging employment discrimination need only present proof sufficient to create an inference of discrimination, *Johnson v. Minnesota Historical Soc.,* 931 F.2d 1239, 1244 (8th Cir. 1991), however, summary judgment is appropriate where the evidence is not susceptible to a reasonable inference sustaining the position of the non-moving party. *Id.*

**III.  Legal standards**

Title VII prohibits employers from engaging in gender discrimination or retaliation against employees "because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [the employee] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). *McDonnell Douglas Corp. v. Green* creates a burden shifting approach for gender discrimination and retaliation cases under which plaintiffs

bear the initial burden of establishing a *prima facie* case. 411 U.S. 792, 800-03 (1973); *Lee v. State of Minn. Dept. of Commerce,* 157 F.3d 1130, 1133 (8th Cir. 1998); *see also Griffith v. City of Des Moines,* 387 F.3d 733, 736-37 (8th Cir. 2004).

In order to establish a *prima facie* case for retaliation, plaintiffs must show:  (1) they engaged in a protected activity, (2) they suffered an adverse employment action and (3) the existence of a causal connection between the protected activity and the adverse employment action.  *See Henthorn v. Capitol Communications, Inc.*, 359 F.3d 1021, 1028 (8th Cir. 2004); *see also Buettner v. Arch Coal Sales Co.*, 216 F.3d 707, 713-14 (8th Cir. 2000) (stating in order to survive summary judgment, plaintiffs must show they "suffered an adverse employment action on account of [their] participation in the protected activity").  "The ultimate burden of proof or persuasion to show that the employer's conduct was motivated by retaliatory intent remains at all times on the Plaintiff." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1119 (8th Cir. 2005).

In order to establish a *prima facie* case for gender discrimination, plaintiffs must show:  (1) they are members of a protected class, (2) they met their employers' legitimate job expectations, (3) they suffered adverse employment actions

and (4) similarly situated employees outside the protected class were treated differently. *Tolen v. Ashcroft,* 377 F.3d 879, 882 (8th Cir. 2004). If Plaintiff can make a *prima facie* case, Defendants must come forward and identify a legitimate, non-discriminatory reason for the adverse employment actions. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 142 (2000). If Defendants meet this burden, the presumption raised by the *prima facie* case disappears, and the burden shifts back to Plaintiff to show that the articulated reason was a pretext for discrimination. *See Tolen,* 377 F.3d at 882. The focus of inquiry at the summary judgment stage always remains on the ultimate question of law--whether the evidence is sufficient to create a genuine issue of fact as to whether the employer intentionally discriminated against the employee because of a protected characteristic. *Strate v. Midwest Bankcentre*, Inc. 398 F.3d 1011, 1018 (8th Cir. 2005).

In 1993, Arkansas created prohibitions in ACRA similar to those of Title VII. Arkansas Code Annotated § 16-123-105 sets out certain civil rights offenses, which provide in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of this state or any of its political subdivisions subjects, or causes to be subjected, any person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Arkansas Constitution shall be liable to the

> party injured in an action at law, a suit in
> equity, or other proper proceeding for
> redress.

ACRA expressly instructs the Court to look to federal civil rights law when interpreting the Act.  Specifically, Arkansas Code Annotated § 16-123-105 states, "When construing this section, a court may look for guidance to state and federal decisions interpreting the federal Civil Rights Act of 1871 . . . ."  *See also Island v. Buena Vista Resort,* 103 S.W. 3d 671, 675 (Ark. 2003).  Accordingly, the Court will analyze Plaintiff's ACRA and Title VII claims co-extensively under established federal precedents construing Title VII.  *See Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 615 n. 3 (8th Cir. 2000).

### IV.  Plaintiff's retaliation claims

Plaintiff claims Defendants violated Title VII and ACRA by taking adverse employment actions against her in retaliation for her complaint concerning her job function.  In order to avert summary judgment of her retaliation claims, Plaintiff must present affirmative evidence to show:  (1) she engaged in a protected activity, (2) she suffered an adverse employment action and (3) the existence of a causal connection between the protected activity and the adverse employment action.  *See Henthorn*, 359 F.3d at 1028.  The Court finds Plaintiff fails to satisfy her burden of creating a genuine

issue as to whether a reasonable jury could find that she has established a *prima facie* case for retaliation.

Plaintiff fails to present affirmative evidence that she engaged in protected activity. While the Court recognizes that "discrimination cases often depend on inference rather than on direct evidence" and thus "summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant," *Crawford,* 37 F.3d at 1341, the Court cannot draw from the record a reasonable inference to support Plaintiff's claims. Plaintiff contends she engaged in protected activity by complaining to her supervisors that she had been "replaced by a guy." However, the basis of Plaintiff's complaint was that she was excluded from performing the brazing function before she was given fair and adequate opportunity to become a proficient brazer. Plaintiff did not attribute her replacement to gender discrimination. In *Hunt v. Nebraska Public Power District*, the United States Court of Appeals for the Eighth Circuit (the "Eighth Circuit") found that an employee "complaining that she was entitled to a pay increase and a change in job title" did not engage in protected activity because "she did not attribute [the employer's] failure to give her a raise or a promotion to sex discrimination." 282 F.3d 1021, 1028 (8th Cir. 2002). Like Plaintiff, the employee in *Hunt* was asked to

reduce her concerns to a written document.  *Id*. at 1025.
Plaintiff's written complaint and her alleged oral complaints,
do not constitute protected activity because they failed to
attribute her employer's conduct to gender discrimination.  In
*Pope v. EAS Services, Inc.*, the Eighth Circuit found that the
plaintiff failed to establish protected activity in the form
of opposing an unlawful employment practice by presenting
evidence that the plaintff "as a preface to expressing his
interest in the district-manager-in-training position, shared
his observations that there were no blacks in the district-
manager position in his region." 406 F. 3d 1001, 1010-11 (8th
Cir. 2005).  The Eighth Circuit explained, "[the plaintiff]
did not attribute the absence of black district managers in
his region to racial discrimination." *Id*.  Finding that the
employee's comments in *Pope* did not constitute a complaint of
unlawful activity, the Eighth Circuit reaffirmed that *general*
complaints concerning employment practices or decisions that
are not expressly characterized as complaints of gender
discrimination do not constitute protected activity under
Title VII.  Plaintiff, by making a comment that employed a
gender term, did not inform her employer that she intended to
make a complaint under Title VII of gender discrimination
anymore than the plaintiff in *Pope*, by making a comment that
employed a race term, informed his employer that he intended

to complain of race discrimination.

In the present case, Plaintiff's handwritten complaint, which she made on the advice of her union representative to document and formalize her concerns, does not discuss gender discrimination implicitly or explicitly.   The complaint centers on Plaintiff's expectation that she would be allowed to braze permanently after training and being told by her supervisor that she would braze and her opinion that she was not given adequate opportunity to become proficient at brazing.  Plaintiff's complaint states, "How was I supposed to learn how to braze if I only [got] to braze one coil"?  (Doc. 21-9 p. 36.)  In addition to her written complaint, Plaintiff claims she made oral complaints on several occasions.  Gender discrimination can be found in neither the spirit nor the letter of Plaintiff's complaints.  While Plaintiff complained of the decision to assign her to pinning as opposed to brazing, she did not indicate that she believed gender discrimination to be the cause of her reassignment.   The record, including Plaintiff's handwritten complaint and the findings of the EEOC Investigator, indicates Plaintiff did not complain of gender discrimination and does not allow a reasonable inference to sustain Plaintiff's claims based on her *post hoc* characterization of her complaints.

When an employee makes a complaint that does not

expressly relate to gender discrimination, there can be no causal connection between that complaint and an adverse employment action taken against the employee.  The essence of a retaliation claim is an employer acting against an employee to strike back at that employee for engaging in protected activity.  There can be no causal connection between protected activity and an adverse employment action when an employer is unaware of the protected activity.  *Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 2006) (finding no causal connection because "none of the members of the hiring committee knew about [the employee's] pending EEOC complaint"); *Wilson v. Northcutt*, 441 F.3d 586, 592-93 (8th Cir. 2006).  The EEOC Investigator that handled Plaintiff's complaint determined that "[Plaintiff] complained to management about not being able to perform the duties, however, she did not complain it was because of her sex, female." (Doc. 21-10 p. 36.)  The Investigator's Recommendation For Closure of Plaintiff's case states, "[Plaintiff] claimed how was she supposed to get faster if [her supervisor] did not allow her to do the job." (Doc. 21-10 p. 36.)  The Investigator determined that Plaintiff did not complain of gender discrimination.  Because Plaintiff, like the plaintiffs in *Hunt* and *Pope*, did not make a complaint of gender discrimination, her employer was not made aware of any protected activity that it might have

retaliated against.

A genuine issue of material fact exists only when a reasonable inference can be drawn to support a plaintiff's contentions, and the ultimate burden of proof to show retaliatory intent remains at all times on the plaintiff. *Wallace*, 442 F.3d at 1119. While the parties disagree on the nature of Plaintiffs' complaint, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48. Because Plaintiff presents no affirmative evidence, or even alleges facts, that would permit a reasonable jury to find protected activity or a causal connection between protected activity and an adverse employment action, Plaintiff's claims must fail. The Court finds insufficient evidence to support an inference of retaliation.

### V.   **Plaintiff's gender discrimination claims**

Plaintiff claims Defendants violated Title VII and ACRA by taking certain adverse employment actions against her based upon her gender. In order to avert summary judgment of her gender discrimination claims, Plaintiff must present affirmative evidence to show: (1) she is a member of a protected class, (2) she met her employer's legitimate job

expectations, (3) she suffered an adverse employment action and (4) similarly situated employees outside the protected class were treated differently. *Tolen,* 377 F.3d at 882. Establishment of a *prima facie* case shifts the burden to Defendants to show a legitimate reason for the adverse employment actions. *See Reeves,* 530 U.S. at 142. If Defendants meet this burden, the burden shifts back to Plaintiff to show that the articulated reason is a pretext for discrimination. *See Tolen,* 377 F.3d at 882.

Defendants do not contest the first and second elements of the *McDonnell* test. Analysis of the third element is difficult, however, because it is unclear at what point Plaintiff alleges the discriminatory treatment to have occurred. While Plaintiff's complaint alleges she was "not given the Brazer job which she was qualified for due to her sex"[5] and terminated in retaliation for her complaints concerning that unfair treatment, (Doc. 2-1 ¶ 12.), Plaintiff later asserts that "[i]t is the designation of Plaintiff as 'not for rehire' that she claims to have been discrimination based on her gender" (Doc. 24 ¶ 67.) and which is "the decision around which this case revolves." (Doc. 23-1 p. 4.)

---

[5]

Similarly, the EEOC Investigator perceived Plaintiff's EEOC charge to be that "she was not allowed to perform her job duties because of her sex." (Doc. 21-10 p. 36.)

Defendants respond to the above allegations in pleadings. However, Plaintiff later states that Defendants' argument "misconstrues the point at which the adverse employment action occurred, however it was not [the] no re-hire recommendation that was the adverse action, nor was it the layoff; rather, it was [Plaintiff's] discharge." (Doc. 23-1 p. 15.)  In order to give complete and meaningful consideration to Plaintiff's claims, the Court will consider each of the above occurrences as possible discriminatory adverse employment actions.  Thus, the issue becomes whether similarly situated employees outside Plaintiff's protected class were treated differently with respect to any of those adverse employment actions without legitimate nondiscriminatory reason.

Defendants contend Plaintiff was assigned to perform the function of pinning, as opposed to brazing, because Line W-80 could not make rate with Plaintiff handling the torch. Plaintiff contends in her complaint she was not allowed to braze because she is female.  However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Scott v. Harris*, 127 S. Ct. 1769, 1776 (April 30, 2007).  The record, taken as a whole, does not permit an inference in support of Plaintiff's contention.  In investigating Plaintiff's claim, the EEOC Investigator found

that Plaintiff's supervisor had reassigned her to pinning because she was too slow at brazing and that there was at that time a female performing the brazing function "that the lead person had no problems with" and who, according to Plaintiff, was "treated better than everyone else on the shift." (Doc. 21-10 p. 36.) Accordingly, the EEOC Investigator found no gender discrimination in Plaintiff's job assignment. Plaintiff does not contest that Line W-80 could not make rate with her brazing. (Doc. 24 ¶ 43.) Plaintiff does not contest that, out of the four employees on Line W-80 that handled gas torches, one was female. (Doc. 21-1 ¶ 23; Doc. 24 ¶ 23.) Gender discrimination cannot be inferred from this evidence. Plaintiff recognizes and accepts a nondiscriminatory reason for her reassignment, i.e. her inability to make rate. Thus, Plaintiff cannot maintain a gender discrimination claim based on Trane's refusal to allow her to operate a torch during the few weeks Line W-80 would be in operation.

Plaintiff contends that she was given a recommendation against rehire based on her gender. Plaintiff's LOW evaluation states that Plaintiff complains about job assignments, is accident prone and lacks experience. In addition, *all* employees, who like Plaintiff had less than one year of employment and a Four Occurrence Letter were not recommended for rehire. Plaintiff does not contest that fact

(Doc. 24 ¶ 71; Doc 21-1 ¶ 71.), and she offers no evidence suggesting the recommendation was a mere pretext. Thus, even if Plaintiff can establish a *prima facie* case based on her recommendation against rehire, Defendants' legitimate reason for the recommendation must defeat Plaintiff's claim. Because Plaintiff was treated identically to all employees with less than one year of employment and a Four Occurrence Letter, the Court cannot infer gender discrimination from her recommendation against rehire.

Defendants contend that the decision to terminate Plaintiff and not to recall her was based solely on her LOW evaluation recommendation against rehire. While Plaintiff contends that she was terminated based on her gender, Plaintiff does not contest that Trane decided not to recall any employee with a recommendation against rehire, that Trane sent termination letters to each of the three senior employees who had such recommendations, that two of those employees were male[6] and that Trane relied exclusively on LOW evaluations in making recall decisions. (Doc. 21-1 ¶¶ 73-76; Doc. 24 ¶¶ 73-76.) Thus, Plaintiff recognizes and accepts a non-discriminatory reason for her termination. Trane terminated

---

[6]

The EEOC Investigator noted that two males were discharged along with Plaintiff in reaching its conclusion that Plaintiff was not subject to gender discrimination. (Doc. 21-10 p. 36.)

only those employees among the ten most senior employees, who were expected to be recalled within the month and who had recommendations against rehire. Regardless of whether Plaintiff's termination violated the CBA, there is no evidence or reasonable inference supporting a finding of gender discrimination in Plaintiff's termination.

In conclusion, the record reflects that Plaintiff was assigned to pin because she was not an efficient brazer, that Trane employed female torch operators, that Plaintiff's Four Occurrence letter was the reason for her recommendation against rehire, that her recommendation against rehire was the reason for her termination and that both the employees terminated with Plaintiff were male. No reasonable inference of discrimination or retaliation can be drawn from this record. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 127 S. Ct. at 1776. Because each of Plaintiff's gender discrimination and retaliation claims must fail, no action can be maintained against Defendant Trane or Defendant Clay Graham. The Court declines to rule on the issue of personal liability under ACRA, raised by the parties in pleadings. Based on the above findings, the

Court determines Defendants did not take adverse employment actions against Plaintiff in retaliation for protected activity or in discrimination of her gender.  Accordingly, the Court concludes Defendants' motion for summary judgment (Doc. 19) is GRANTED.

### C.   Conclusion

Based on the foregoing, the Court determines Defendants' motion for summary judgment (Doc. 19) is GRANTED as to Plaintiff's retaliation and gender discrimination claims under Title VII of the Civil Rights Act of 1964 and ACRA, and those claims are DISMISSED WITH PREJUDICE as against both Defendants.

IT IS SO ORDERED this 20th day of September 2007.


/s/ Robert T. Dawson
Robert T. Dawson
United States District Judge